**SIMOD AMERICA CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 85-5-00649.**

United States Court of International Trade.

July 28, 1988.

Rode & Qualey (Michael S. O'Rourke, New York City, on the brief, and at the trial), for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch (Barbara M. Epstein, New York City, on the brief, and at the trial), for defendant.

Lamb & Lerch, Richard J. Kaplan, New York City, for amicus curiae, Rubber and Plastic Footwear Manufacturers Ass'n, Inc.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Italy from 1980 to 1984, and described on the customs invoices as shoe "uppers."

The merchandise was classified by the Customs Service as "[f]ootwear" under items 700.35 and 700.67 of the Tariff Schedules of the United States (TSUS), depending upon the amount of leather on the exterior surface, and duty was imposed as required under those items. Pursuant to General Interpretative Rule 10(h), TSUS, which provides that "a tariff description for an article covers such article ... whether finished or not finished," "unfinished" footwear is included within the tariff description for "[f]ootwear." Plaintiff protests this classification and contends that the merchandise having an exterior of more than 50 percent leather is properly classifiable as shoe "uppers" under item 791.27, TSUS, or alternatively as articles of leather not specially provided for under item 791.90, TSUS. As for the merchandise having an exterior surface of less than 50 percent leather, plaintiff contends that it is properly classifiable as articles of textile not specially provided for under items 386.-04, 386.07, or 386.50, TSUS.

Although the duties imposed by Customs and those claimed by plaintiff varied depending upon the amount of leather on the exterior surface, the duties on "unfinished" footwear are considerably higher than those imposed for parts or components of shoes. Hence, plaintiff protests the classification as "unfinished" footwear since, in its opinion, the imported merchandise required substantial additional manufacturing processes in the United States before it could be sold as footwear. Relying upon *Daisy-Heddon, Div. Victor Comptometer Corp. v. United States*, 66 CCPA 97, C.A. D. 1228, 600 F.2d 799 (1979), plaintiff urges that the nature, extent, and relative value of these additional manufacturing processes prevent classification as "unfinished" footwear, and require that the merchandise, as imported, be classified as parts or components of shoes or shoe "uppers." The defendant, however, maintains that the merchandise was "unfinished" footwear since the imported shoe uppers also contained an "underfoot," and, being substantially complete, the imported merchandise was properly classified as "unfinished" footwear.

The pertinent statutory provisions of the tariff schedules are as follows:

For merchandise having an exterior surface of more than 50 percent leather:
Classified under:
    Schedule 7, Part 1, Subpart A:
    Footwear, of leather (except footwear with uppers of fibers):

       . . . .
    Other:
700.35    For men, youths, and boys . . . . . . . . . . . . . . . . . . .8.5% ad val. (1980–84)
Claimed under:
    Schedule 7, Part 13, Subpart B:
    Leather cut or wholly or partly manufactured into forms or shapes suitable for conversion into footwear:

      . . . .
      Other:

791.27 Uppers ........................................5% ad val. (1980)
4.8% ad val. (1981–83)
4.4% ad val. (1984)

Alternatively claimed under:
   Schedule 7, Part 13, Subpart B:
   Articles not specially provided for, of leather:
    . . . .
791.90  Other ..................................3.5% ad val. (1980)
3% ad val. (1981)
2.5% ad val. (1982)
2% ad val. (1983)
1.5% ad val. (1984)

For merchandise having an exterior surface of less than 50 percent leather:
Classified under:
   Schedule 7, Part 1, Subpart A:
   Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:
    . . . .
    Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):
     . . . .
     Other:
      . . . .
      Other:
       . . . .
700.67      Valued over $3.00 but not over $6.50 per pair ................................90¢ per pr. + 37.5% ad val. (1981–1984)

Claimed under:
   Schedule 3, Part 7, Subpart B:
   Articles not specially provided for, of textile materials:
    Lace or net articles, whether or not ornamented, and other articles ornamented:
386.04    Of cotton: ...............................40% ad val. (1980–81)
     Shoe uppers .........................37% ad val. (1982)
34% ad val. (1983)
31% ad val. (1984)
    Other:
386.07     Shoe uppers .........................25% ad val. (1980–81)
22.5% ad val. (1982)
20% ad val. (1983)
17.5% ad val. (1984)
    Other articles, not ornamented:
     Of cotton:
      . . . .
386.50     Other ...............................14% ad val. (1980–81)
      Shoe uppers      12.8% ad val. (1982)
11.7% ad val. (1983)
10.5% ad val. (1984)

---

The question presented is whether the imported merchandise has been properly classified by the Customs Service as "unfinished" footwear under items 700.35 and 700.67, TSUS, or whether it is properly classifiable as shoe "uppers" or other articles not specially provided for under items

791.27, 791.90, 386.04, 386.07, or 386.50, TSUS. In order to decide the question presented, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed.Cir.1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1982), the classification of the Customs Service is presumed to be correct and the burden of proof is upon the party challenging its classification.

After an examination of the merchandise, the exhibits, the testimony, and the pertinent lexicographic definitions, the court holds that plaintiff has not overcome the presumption of correctness, and the classification is sustained. The imported merchandise predominantly of leather was "unfinished" footwear and was properly classified as "[f]ootwear," under item 700.-35, TSUS, and the imported merchandise predominantly of textile was also "unfinished" footwear and was properly classified as "[f]ootwear," under item 700.67, TSUS.

The imported articles are athletic shoe uppers with a piece of material, called the "underfoot," sewn on the bottom. From 1980 to 1984, Simod America Corporation (Simod), the American subsidiary of an Italian corporation, imported the merchandise to its factory in Middletown, Rhode Island. At the Middletown plant, various styles of athletic footwear were finished by the production and addition of soles through a polyurethane injection molding process.

Simod's Italian parent corporation commissioned independent Italian stitching rooms to prepare the merchandise for importation, and supplied the stitching rooms with leather, certain nonleather components, and specialized machinery. In accord with directions submitted by Simod's parent corporation, workers at the stitching rooms cut the leather into parts and stitched those parts together. Various nonleather components were also attached in the stitching rooms. The final part attached by the stitching room workers was a piece of material, which was sewn to the bottom of each imported article. This part

is called the "underfoot." The underfoot aids or makes possible the attachment of a sole to the imported article.

At Simod's factory in Middletown, Rhode Island, the imported merchandise was fitted with a sole. The centerpiece of Simod's factory is the Desma 513, a 24–station machine that uses a polyurethane injection process to make soles and attach them to the imported articles. The "uppers" with the attached "underfoot" were placed on lasts (forms molded in the size and shape of a shoe), and the Desma machine injected polyurethane onto the bottom of each article. The underfoot served to keep the imported merchandise on the last and permitted the injection of polyurethane onto the underfoot. Without the attached underfoot, the polyurethane would leak out from the imported merchandise, preventing the formation of a sole. After the polyurethane soles hardened, Simod's employees cleaned and labeled the footwear. Before being shipped from the factory, the shoes were packaged and put into a condition suitable for retail sale.

Simod contends that the imported merchandise is properly classifiable as shoe "uppers." Specifically, Simod contends that the merchandise predominantly of leather should be classified under item 791.27, TSUS, or alternatively as articles of leather not specially provided for under item 791.90, TSUS. As for the merchandise predominantly of textile, Simod contends that it should be classified under items 386.04, 386.07, or 386.50, TSUS.

Defendant contends that the merchandise was properly classified as "[f]ootwear" under items 700.35, TSUS, and 700.-67, TSUS, since under General Interpretative Rule 10(h), the descriptive heading "[f]ootwear" includes the unfinished product.

General Interpretative Rule 10(h) of the Tariff Schedules of the United States, in pertinent part, provides that:

unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and *whether finished or not finished*.... (emphasis added)

In order to determine whether the imported merchandise is properly classified as unfinished footwear, the court must determine whether the imported merchandise is a "substantially complete" product. *See Authentic Furniture Prods., Inc. v. United States*, 68 Cust.Ct. 204, 215, C.D. 4362, 343 F.Supp. 1372, 1380 (1972), *aff'd*, 61 CCPA 5, C.A.D. 1109, 486 F.2d 1062 (1973). In *Authentic Furniture*, the plaintiff imported certain unassembled parts of bunk beds and protested the Customs Service's classification of the articles under item 727.40, TSUS, as "parts of furniture." Plaintiff, citing General Interpretative Rule 10(h), contended that the unassembled parts of beds were properly classifiable under a TSUS item for "furniture other than chairs." The Customs Court held that the imported articles did not "constitute a substantially complete article," and on this ground sustained Customs' classification. 68 Cust.Ct. at 215, 343 F.Supp. at 1380. On appeal, the Court of Customs and Patent Appeals affirmed the decision of the Customs Court, but added, "the absence of a substantial or essential part precluded classification as the unfinished article...." *Authentic Furniture*, 61 CCPA at 7, 486 F.2d at 1064.

In *Daisy–Heddon, Div. Victor Comptometer Corp. v. United States*, 66 CCPA 97, C.A.D. 1228, 600 F.2d 799 (1979), the Court of Customs and Patent Appeals, after carefully reviewing the decision of the Customs Court in *Authentic Furniture*, stated that "the basis of the decision in that case was that 'it is the determination of this court that the importations do not constitute a substantially complete article.'" *Id.* at 102, 600 F.2d at 803 (quoting *Authentic Furniture*, 68 Cust.Ct. at 215, 343 F.Supp. at 1380). Recognizing that its opinion in *Authentic Furniture* "could result in decisions which are at odds with what we perceive to be the intent of Congress as expressed in general interpretative [Rule] 10(h)," the Court of Customs and Patent Appeals overruled its *Authentic Furniture* opinion "[t]o the extent that [it] may be so read as providing a test other than the test used in that case by the Customs Court...." *Daisy–Heddon*, 66 CCPA at 102, 600 F.2d at 802.

In *Swift Instruments, Inc. v. United States*, 4 CIT 88, 93, 554 F.Supp. 1235, 1239 (1982), *aff'd*, 714 F.2d 161 (Fed.Cir.1983), this court held that certain microscopes, imported without lenses, were substantially complete articles, and thus, were properly classified under TSUS items 708.71–73 as unfinished "microscopes." The court recognized that the missing lenses were essential parts, and that the imported merchandise could not function as microscopes without the lenses. The court, however, citing *Daisy–Heddon*, determined that the absence of an essential part did not preclude classification as a substantially complete article. *See Swift Instruments*, 4 CIT at 91, 554 F.Supp. at 1237–38. Similarly, in *Channel Master, Div. of Avnet, Inc. v. United States*, 10 CIT ——, 648 F.Supp. 10, 16 (1986), *reh'g denied*, 11 CIT ——, 674 F.Supp. 872 (1987), the court held that radio receivers, imported without crystals that were necessary to allow the imported articles to perform any of the basic functions of radio receivers, were nevertheless substantially complete articles, and were properly classified under items 685.23 or 685.24, TSUS, as "radio receivers."

The determination whether an article is substantially complete, "is properly made by considering the circumstances surrounding each particular importation to determine the significance of what has been omitted, and the efforts necessary to place the completed article into the flow of commerce." *Swift Instruments*, 4 CIT at 91, 554 F.Supp. at 1238. In *Daisy–Heddon*, the court listed five factors which must be considered in determining whether an imported article is "substantially complete." The factors set forth in *Daisy–Heddon* are:

(1) [c]omparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in the imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and

(5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article.

*Daisy Heddon,* 66 CCPA at 102, 600 F.2d at 803. Although these factors are not dispositive of the classification issue, they are indeed helpful "in resolving ... whether the article is substantially complete." *See Channel Master,* 10 CIT at ——, 648 F.Supp. at 15.

With the aid of a video presentation of the manufacturing process, the case for plaintiff was urged with great skill and diligence. Nevertheless, an analysis of the *Daisy–Heddon* factors, together with a review of the lexicographic definitions and the specific exhibits introduced at trial, lead to the conclusion that the merchandise was substantially complete footwear, and, hence, was properly classified by the Customs Service as "unfinished" footwear.

The first *Daisy–Heddon* factor requires a comparison of the number of components assembled in Italy with the number added after importation. Plaintiff admitted that a greater number of components of the footwear were assembled in Italy, before exportation to the United States, than were added in the United States. Mr. Bruno Picelli, the technical manager for Simod's parent corporation, identified approximately 25 different parts of the shoes that were stitched together in Italy. In contrast, Mr. Picelli stated that only four components of the completed footwear were added at Simod's Middletown plant.

The second factor noted in *Daisy–Heddon* calls for a comparison of the relative time and effort involved in the production of the footwear, both before and after importation. In answer to appropriate questions by counsel, Mr. Picelli narrated a video illustrating the preparation of the merchandise before importation. The merchandise was produced in independent stitching rooms commissioned by Simod's parent corporation. The stitching room workers began production of the footwear by cutting leather into the required shapes. The leather had to be cut by hand. On cross-examination, Mr. Picelli explained that "[w]hen you cut normally you should follow a certain sense, [or] direction to cut...." Next, the leather was cleaned and prepared for the production line. On the production line, stitching room workers ornamented the leather and stitched together the various pieces of leather that comprised the footwear. The video showed stitching room workers attaching eye stays, a process described by Mr. Picelli as "one of the most complex operations" in the manufacture of shoes. The stitching room employees used special machines, provided by Simod's parent corporation, to attach the toe cap and the counterpanels to the stitched leather parts. The last part attached to the article by the stitching room employees was the underfoot. Mr. Picelli testified that the application of the underfoot was done "with a very special machine, which makes a continuous chain stitching."

Another witness for the plaintiff, Dr. Arrigo Gambro, who is the executive vice president of Simod's parent corporation, estimated that the time necessary to stitch one pair of the imported articles was 15 minutes. Mr. Picelli testified that a typical stitching room could produce more than 1000 pairs of the imported articles in an 8–hour shift. However, he acknowledged that because of the various types of merchandise being produced and the differing number of workers present, any estimate was unreliable.

Mr. Gino Pezzin, the former production manager at Simod's Middletown factory, narrated a video illustrating the completion of the merchandise at the plant. The workers at the factory fitted the imported articles onto the Desma last, and pounded the imported articles into the shape of a shoe. The machine then produced and attached a sole by making two injections of polyurethane onto the bottom of the imported merchandise. Each shoe required less than 1 minute on the Desma machine. Mr. Pezzin estimated that the Desma machine released, on average, 600 pairs of shoes for every 8–hour shift. After the soles were allowed to harden, the merchandise entered the finishing line, where workers scraped

off excess polyurethane, cleaned, and packaged the footwear. Mr. Odino Bertin, an employee of Simod responsible for the Middletown finishing line from 1980 to 1985, estimated that the finishing line turned out 900 to 1000 pairs of completed shoes per 8-hour shift.

In contrast to the labor-intensive craftsmanship demonstrated at the Italian stitching rooms, the Middletown factory procedure was highly industrialized. The factory workers performed such tasks as mixing chemicals for use in the injection process, placing the imported merchandise on lasts, spraying a release agent on the lasts, and, generally, keeping the Desma machine clean and functioning. Simod's production line employees cleaned the shoes, added foam inserts and laces, and placed the shoes in boxes. None of these tasks involved considerable skill. The workers at the Italian stitching rooms, however, performed most of their work by hand. The workers employed at the Italian stitching rooms were more skilled than Simod's factory workers. Hence, Simod expended more time and effort in the production of the shoes into their imported condition than in finishing them at the Middletown factory.

The third factor recognized by the *Daisy–Heddon* court requires a comparison of the cost of the parts assembled before importation with the cost of the parts added at the Middletown factory. The exhibits and the trial testimony show clearly that the pre-import production process was not only more elaborate, but also more expensive than the completion of the footwear at Middletown. For example, plaintiff's exhibits and trial testimony show that the prices of labor and materials used to assemble a pair of the imported articles, prior to importation, varied from approximately $3.00 to $6.00. In contrast, the cost of materials and labor used in the polyurethane injection process and the finishing process was $2.50 or less, depending on the particular type of soles produced.

The fourth *Daisy–Heddon* factor calls for an analysis of "the significance of the omitted parts to the overall functioning of the completed article...." *Id.* 66 CCPA at 102, 600 F.2d at 803. According to plaintiff's witness, Mr. Picelli, the parts missing from the imported merchandise were an outsole, an arch cookie (a rubber insert glued to the insole to provide support for the foot), laces, and a removable foam insole. Through the testimony of several witnesses, plaintiff indicated that without a sole the imported articles could not be worn outdoors. Mr. Picelli stated that the imported article could not be used as footwear, and explained that "[t]he essential part, which is the sole, is missing." In its brief, defendant admits that "a sturdy outsole is essential for the merchandise to practically function outdoors in its intended use and to be commercially saleable." It is important to note, however, that the absence of an essential part does not prevent merchandise from being "substantially complete" for customs classification purposes. *See Daisy–Heddon*, 66 CCPA at 101–02, 600 F.2d at 802–03. As explained in *Channel Master*, "[i]n determining whether an article is an unfinished article under Rule 10(h), the question is whether the article is 'substantially complete,' not whether it lacks an 'essential' part." 10 CIT at ——, 648 F.Supp. at 16. Hence, the fact that the imported merchandise cannot properly function as footwear because it lacks an essential element, a sole, does not preclude classification of the merchandise as "unfinished" footwear.

The final *Daisy–Heddon* factor is whether the footwear trade considers the imported article to be "unfinished" footwear or only a "part" of footwear. Several of plaintiff's witnesses testified that in the footwear trade, the imported merchandise is known as a finished upper. Mr. Harold McGowan, the former president of Endicott–Johnson, an American shoe manufacturer, stated that the imported article was a "completed upper" ready for slip lasting, the process used at Simod's Middletown factory, to shape the article into the desired form and size. Testimony to the same effect was given by Mr. John P. O'Neill, former president and present vice chairman of the board of directors of Converse, Inc., an American manufacturer of athletic

shoes, and by Dr. Arrigo Gambro, executive vice president of Simod's parent corporation.

On this aspect of the case it is pertinent to note that "[t]he meaning of a tariff term is presumed to be the same as its common or dictionary meaning in the absence of evidence to the contrary." *Bentkamp v. United States,* 40 CCPA 70, 78 (1952). Hence, defendant introduced the definition of "upper" which is accepted by the American Society of Testing Materials (ASTM). The ASTM defines an upper as "all of the upper parts of a shoe stitched together and ready for lasting and bottoming. It includes both the outside and lining of the shoe." Defendant also introduced definitions from *The Century Dictionary and Cyclopedia,* quoted in *United States v. Shokai,* 14 CCPA 392, 396 (1927) (an upper is "[t]he upper part of a shoe . . . comprising the vamp and quarters") and *Webster's Third New International Dictionary* (upper defined as "parts of a shoe . . . that are above the sole"). Defendant's witness, Mr. Milton Bailey, a physical scientist who works at the United States Navy clothing and textile research facility in Natick, Massachusetts, stated that the imported merchandise fits none of the dictionary definitions of "upper." Mr. Bailey, a former chairman of committees of the ASTM and the holder of many footwear patents, testified and explained that because of the presence of the "underfoot" the imported articles are not uppers.

Merchandise similar to that in issue was the subject of judicial analysis in *Uniroyal, Inc. v. United States,* 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd,* 702 F.2d 1022 (Fed.Cir.1983). In *Uniroyal,* the Customs Service denied importation of plaintiff's shoe uppers, which contained an attached bottom and resembled mocassins, because they lacked country of origin markings pursuant to 19 U.S.C. § 1304(a) (1982). Plaintiff protested, alleging that the imported articles were exempt from country of origin markings, because they underwent a "substantial transformation" after entry into the United States. *Uniroyal,* 3 CIT at 223, 542 F.Supp. at 1029. The court, in sustaining the Customs Service's decision, stated that the upper "in its condition as imported is already a substantially complete shoe. . . ." *Id.* at 224, 542 F.Supp. at 1029. Although the court in *Uniroyal* examined the importation to determine whether the merchandise had been marked to indicate country of origin, the reasoning nevertheless lends support to defendant's contention that the imported merchandise, consisting of shoe uppers with an attached underfoot, is substantially complete footwear.

In conclusion, it may be well to add that in classification cases, the merchandise itself is a potent witness. *Marshall Field & Co. v. United States,* 45 CCPA 72, 81, C.A.D. 676 (1958). Despite the absence of a sole and laces, it is clear that the merchandise resembles footwear. A viewer of the imported merchandise would immediately recognize it as athletic footwear.

In view of the foregoing, it is the holding of the court that plaintiff has failed to rebut the presumption of correctness that attaches to the Customs Service classification. Accordingly, since the merchandise predominantly of leather was properly classified as unfinished "[f]ootwear" under item 700.35, TSUS, and the merchandise predominantly of textile was properly classified as unfinished "[f]ootwear" under item 700.67, TSUS, plaintiff's action is dismissed.