SIMOD AMERICA CORP.,
Plaintiff–Appellant,

v.

The UNITED STATES,
Defendant–Appellee.

No. 88–1637.

United States Court of Appeals,
Federal Circuit.

April 19, 1989.

Michael S. O'Rourke, of Rode & Qualey, New York City, argued for plaintiff-appellant. With him on the brief were William J. Maloney and Eleanore Kelly–Kobayashi.

Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office, Dept. of Justice, New York City, argued for defendant-appellee. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, and Barbara Epstein.

Before RICH and BISSELL, Circuit Judges, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

Simod America Corp. ("Simod") appeals from the judgment of the United States Court of International Trade holding that its shoe components imported from Italy in 1980–84 are dutiable as footwear under items 700.35 and 700.67 of the Tariff Schedules of the United States (TSUS). *Simod America Corp. v. United States,* 693 F.Supp. 1172 (Ct. Int'l Trade 1988) (Re, C.J.). We reverse and remand.

## Background

Simod imported partially constructed athletic shoes from Italy. As imported, the articles included an upper, the portion of the shoe that covers the top of the foot ("the shoe top"), and a thin piece of fabric, called an underfoot, which was sewn in the location where the shoe sole was ultimately to be placed and remained there on completion of the shoe. Some of the shoe tops had an exterior of more than 50 percent leather and others did not.

The manufacturing performed in Italy was begun by applying a cutting die to a sheet of textile or leather materials. Leather materials were cleaned and skived (pared) before proceeding to the production line. The pieces of cut material were then stitched together and ornamented. Next, eye stays were applied to the shoe material and then metal eyes were attached with the use of a fully automated machine, and counterpanels were glued to the articles by a thermosetting machine. Finally, an underfoot was attached to the shoe top in the location where the sole was ultimately to be placed. The underfoot is a necessary preparation for lasting.

The shoe tops were imported into the United States where they were lasted and provided with shoe soles and manufactured into finished athletic shoes at a factory in Middletown, Rhode Island. The soles manufactured at the Middletown plant were of a type produced by injecting liquid polyurethane into a mold and allowing it to harden. The polyurethane injection process was skillfully demonstrated to this court and the trial court by way of a videotape.

The process of making the polyurethane shoe soles centers around a machine known to the trade as a Desma 513/24. The Desma is a massive piece of equipment costing $800,000 to one million dollars. The machine has 24 stations, each station having a mold which forms the shoe sole and a last which is used to shape the shoe top into an appropriate form. Because shoes come in different sizes, 30 to 40 pairs of different size lasts are required. The lasts are individually hand crafted, and one set of 30 to 40 lasts takes approximately an entire year to produce. Thus, before even a beginning

of the shoe sole injection process, significant start-up time and start-up costs were incurred.

The shoe sole manufacturing process began by heating the polyol and isocyanate chemicals which make up the polyurethane shoe soles in separate ovens at differing temperatures for 24 and 48 hours, respectively. The polyol material was then dyed with a coloring suspension, a procedure which required 20 to 40 minutes time. The molds at each station of the Desma machine were thoroughly cleaned to remove remnants of polyol from prior injections and then sprayed with releasing agents.

Next, the imported merchandise was mounted onto the last and mold at each station and secured in place by the underfoot. The shoe top was hammered by hand to take the shape of the last. Cement was applied to the bottom and sides of the shoe top, and polyurethane was then injected into the mold to form the outsole of the shoe.

The Desma has a control panel which regulates many of the machine's operations. A timer is set to control the duration of the injection; a counter regulates the quantity of polyurethane injected into the mold and the ratio of polyurethane to isocyanate. The quantity of material injected is varied by the control panel according to the size of the shoe being made.

A first injection of polyurethane was shot into a mold at each station to form the shoe outsole. After the first injection was completed, the mold release agent was removed from the shoe outsole. Failure completely to remove the release agent would have prevented the second injection from adhering properly and ruined the partially constructed merchandise. Once the release agent was completely removed from the outsole, a second injection was shot into each mold to create the shoe midsole. The mold had to be properly sealed to the shoe top, as improper sealing between the shoe top and the mold causes the polyurethane to seep out and create a defective shoe. After the second injection was successfully performed, the shoe soles required between 12 and 24 hours to harden. After hardening, the shoes were passed through a finishing line where they were trimmed, cleaned, and otherwise touched up through the use of both hand and machine labor. The operations performed on the finishing line took approximately 20 minutes per pair.

To the extent the above-discussed details of the manufacturing process were not found by the trial court, they are undisputed in the record before us.

Turning now to the classifications at issue, the relevant tariff provisions for the leather shoe tops are:

Classified under:
    Schedule 7, Part 1, Subpart A:
    Footwear, of leather (except footwear with uppers of fibers):
       * * * *

    Other:
700.35    For men, youths, and boys.........8.5% ad val. (1980–84)

Claimed under:
    Schedule 7, Part 13, Subpart B:
    Leather cut or wholly or partly manufactured into forms or shapes suitable for conversion into footwear:
       * * * *

    Other:
791.27    Uppers.........................5%  ad val. (1980)
                              4.8% ad val. (1981–83)
                              4.4% ad val. (1984)

Alternatively claimed under:
    Schedule 7, Part 13, Subpart B:
    Articles not specially provided for, of leather:
       * * * *

791.90    Other.........................3.5% ad val. (1980)
                              3%  ad val. (1981)

791.90    Other .............................2.5% ad val. (1982)
                                                     2%   ad val. (1983)
                                                    1.5% ad val. (1984)

The pertinent tariff provisions for the articles having an exterior surface of less than 50 percent leather are:

Classified under:
        Schedule 7, Part 1, Subpart A:
        Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:
                * * * *

                Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):
                        * * * *

                Other:
                        * * * *

                Other:
                        * * * *

700.67            Valued over $3.00 but not over
                  $6.50 per pair .................90¢   per   pr.
                                                  + 37.5% ad val.
                                                  (1981–1984)

Claimed under:
        Schedule 3, Part 7, Subpart B:
        Articles not specially provided for, of textile materials:
                Lace or net articles, whether or not ornamented, and other articles ornamented:
        386.04            Of cotton: ....................40% ad val. (1980–81)
                          Shoe uppers .............37%  ad val. (1982)
                                                   34%  ad val. (1983)
                                                   31%  ad val. (1984)
                Other:
        386.07            Shoe uppers .............25%  ad val. (1980–81)
                                                   22.5%ad val. (1982)
                                                   20%  ad val. (1983)
                                                   17.5%ad val. (1984)

        Other articles, not ornamented:
                Of cotton:
                        * * * *

        386.50            Other ...................14%  ad val. (1980–81)
                                                   12.8%ad val. (1982)
                                                   11.7%ad val. (1983)
                                                   10.5%ad val. (1984)

---

The imported merchandise was classified by the Customs Service ("Customs") as unfinished "footwear" under items 700.35 and 700.67, and that classification was sustained by the Court of International Trade.

### Issue

Whether the trial court clearly erred in determining that the imported merchandise is properly classified under the "footwear" provisions.

### Discussion

#### I

General Interpretative Rule 10(h) of the TSUS provides, in pertinent part, that:

unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished.

Customs contends that the imported merchandise was properly classified as unfinished footwear pursuant to Rule 10(h). In

order to pass on the correctness of this proposition, we must first examine the definition of unfinished footwear and determine whether the imported merchandise fits that definition.

■ The trial court defined unfinished footwear as "substantially complete" footwear. *Simod*, 693 F.Supp. at 1176. Neither party contends that this definition is in error nor do we. *See, e.g., Channel Master, Div. of Avnet, Inc. v. United States*, 856 F.2d 177 (Fed.Cir.1988) (imported assemblies which constitute a substantially complete article are classified as the completed article). While Simod asserts error in the trial court's failure to establish a definition of footwear, the definition of a classification term is a question of law which we are free to determine for ourselves by resort to lexicographic and other materials. *Convertors Div. of Am. Hosp. Supply Corp. v. United States*, 861 F.2d 710, 712 (Fed.Cir.1988). Tariff terms are construed according to their common and commercial meanings which are presumed to be the same. *Nippon Kogaku (USA), Inc. v. United States*, 673 F.2d 380, 382, 69 C.C.P.A. 89 (1982). Webster's Third New International Dictionary, Unabridged, at 886 (1976) defines footwear as:

> wearing apparel for the feet (as shoes, boots, slippers, overshoes) usu. excluding hosiery.

It is not disputed that at the completion of the manufacturing process, the imported articles will be wearing apparel for the feet; therefore, the key issue is whether the imported articles are "substantially complete" wearing apparel for the feet, or "substantially complete" footwear.

■ While the meaning of a classification term is a question of law, the issue of whether particular imported articles come within the definition of a classification term is a question of fact subject to the clearly erroneous standard of review. *Childcraft Education Corp. v. United States*, 742 F.2d 1413, 1414, 2 Fed.Cir. (T) 121, 122 (1984). *See also BASF Wyandotte Corp. v. United States*, 855 F.2d 852 (Fed.Cir. 1988); *Daw Industries, Inc. v. United States*, 714 F.2d 1140, 1142, 1 Fed.Cir. (T) 146, 148 (1983). The classification of the Customs Service is presumed to be correct

and the burden of proof is upon the party challenging its classification. 28 U.S.C. § 2639(a)(1); *Childcraft*, 742 F.2d at 1414, 2 Fed.Cir. (T) at 122.

■ Our predecessor court fashioned a test for determining substantial completeness in *Daisy–Heddon, Div. Victor Comptometer Corp. v. United States*, 600 F.2d 799 (CCPA 1979), recognizing, however, that not all of the factors of the test will be applicable to a particular importation, and additional unstated factors may bear on the issue. The *Daisy–Heddon* factors are:

(1) comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article.

600 F.2d at 803.

With regard to the first factor, the trial court properly found that 25 parts are assembled in Italy to comprise the imported article. With the addition of only four omitted parts, the shoes would be complete. This factor weighs in favor of finding substantial completeness.

Turning to the second factor, we compare the time and effort required to complete manufacture of the article after importation with the time and effort required to place the article in its imported condition. The trial court found:

> In contrast to the labor-intensive craftsmanship demonstrated at the Italian stitching rooms, the Middletown factory procedure was highly industrialized. * * * None of these tasks [performed in the Middletown factory] involved considerable skill. The workers at the Italian stitching rooms, however, performed most of their work by hand. The workers employed at the Italian stitching rooms were more skilled than Simod's factory workers. Hence, Simod expend-

ed more time and effort in the production of the shoes into their imported condition than in finishing them at the Middletown factory.

*Simod,* 693 F.Supp. at 1178.

The operations performed in Italy were carried out with the aid of equipment markedly less sophisticated than the Desma machine, but requiring more hand labor. There were machines but of the individually operated tabletop variety. The Middletown factory required relatively little hand labor, but employed sophisticated and expensive equipment requiring intensive supervision and maintenance. The fact that the Middletown operation was largely mechanized does not detract from the substantial nature of the manufacturing efforts undertaken there. In its analysis, the trial court ignored the capital-intensive nature of the Middletown manufacturing plant. The expensive and sophisticated nature of the equipment used at the Middletown plant indicates to this court it is clear error to hold that a substantial effort is not needed to place the imported articles into a completed condition.

It is a principle of Customs law that imported merchandise is dutiable in its condition as imported, except in the instance (not here involved) of deception, disguise, or artifice resorted to for the purpose of perpetrating a fraud of the revenue; what is going to be done with it afterwards is not relevant. *United States v. Citroen,* 223 U.S. 407, 32 S.Ct. 259, 56 L.Ed. 486 (1912). *Sturm,* Customs Law and Administration § 54.1 at 1 (3d ed. 1982 & Supp. 1988). If this writer may speak out of personal knowledge, the principle is so basic it hardly needs to be mentioned in any discussion of a classification problem by judges, officials, or lawyers having any serious involvement in such matters. The well-informed CCPA that promulgated *Daisy–Heddon, supra,* was well aware of it, *Carrington Co. v. United States,* 497 F.2d 902, 61 C.C.P.A. 77 (1974); *United States v. Baker Perkins, Inc.,* 46 CCPA 128, 131, C.A.D. 714 (1959); *United States v. Lo Custo & Funk,* 17 CCPA 342, T.D. 43777 (1929), and in using, as a test of substantial completeness, the comparison of the labor required before importation, and for full completion after importation, it did not intend a breach of the basic rule. It would be a startling breach if two identical entries were classified differently because, after importation, one was destined for completion in a labor-intensive operation, and the other in a capital-intensive operation. The purpose of the *Daisy–Heddon* tests is to determine the extent the imported article is the completed article, unfinished, and that is the same in either of the cases supposed above. Accordingly, it is implicit in the *Daisy–Heddon* tests, and explicit so far as the occasional necessity of other unstated tests is there recognized, that labor-intensivity alone cannot be made a test of completeness where there is a great difference in the extents of capital intensivity in the manufacturing operation before and after importation. After all, one does not have to be a disciple of Karl Marx to recognize that somebody's labor at some time made possible the capital-intensive operation that eliminates recourse to much direct labor in the United States phase of production of the involved footwear. As the learned Chief Judge overlooks this, his analysis is clearly erroneous.

Apart from the costly equipment needed to process the imported articles, the time required to transform them into completed footwear is significant. The trial court found that the Desma machine produced 1,200 shoes in an 8-hour shift and that each shoe required less than one minute on the Desma machine. There is uncontradicted evidence that each shoe remained in its mold on the Desma machine for approximately two minutes after the two polyurethane injections were shot. In the face of this evidence, the finding that each shoe required less than one minute on the Desma machine is clearly erroneous.

Further, the trial court improperly focused on the output rate of the Desma machine without considering the fact that it processes many articles simultaneously. The relevant inquiry is not how many shoes can be produced per day. The relevant inquiry is how much time is spent to complete manufacture of each imported article. *See Daisy–Heddon,* 600 F.2d at 803 ("the time and effort required to complete the

article"). The Desma machine simultaneously processes 24 articles, and the output rate must be appropriately adjusted. Using the trial court's output rate findings, the process time *per shoe* is:

$$\frac{8 \text{ hours}}{1{,}200 \text{ shoes}} \times 24 \text{ stations} = 9.6 \text{ minutes per shoe}$$

or 19.2 minutes of processing time per pair. In addition to the time on the Desma machine, the shoes required between 12 and 24 hours to harden and 20 minutes on the finishing line.

The Italian stitching rooms required approximately 17 minutes (15 minutes processing time plus 2 minutes cutting time per pair) to prepare the imported merchandise. Clearly, the time required to complete manufacture of the imported articles is greater than that required to place them in their imported condition.

Considering the substantial time and effort invested in completing construction of the athletic shoes, the trial court clearly erred in finding that "Simod expended more time and effort in the production of the shoes into their imported condition than in finishing them at the Middletown factory." *Simod,* 693 F.Supp. at 1178.

The third *Daisy–Heddon* factor involves the cost of the imported article compared to the cost of the omitted parts. Due to the capital-intensive nature of the Middletown operation, the cost of adding the omitted shoe sole would properly include the indirect cost of using the Desma machine. Certainly the machine depreciates as each shoe comes off the production line. The record reveals the following direct costs of producing the shoe soles:

| | |
|---|---|
| polyurethane | $1.40 |
| insole | .21 |
| laces | .11 |
| mold release | .15 |
| labor | .66 |
| TOTAL | $2.53 |

The trial court apparently relied upon the above figures, as it found that the cost of producing the shoe soles was $2.50 or less. *Simod,* 693 F.Supp. at 1178. No evidence was introduced reflecting the indirect cost of using the Desma machine. In the absence of that information, the comparison of the cost to produce the imported articles with the cost to complete their manufacture in Middletown is not probative.

■ The fourth *Daisy–Heddon* factor focuses on the significance of the omitted parts. The absence of an essential part does not preclude a finding of substantial completeness, *Channel Master, Div. of Avnet, Inc. v. United States,* 856 F.2d 177, 179 (Fed.Cir.1988); *Daisy–Heddon,* 600 F.2d at 802–803, but it does tip the balance away from such a finding.

The fifth and final inquiry specified in *Daisy–Heddon* is whether the trade recognizes the article as unfinished footwear or merely a component of footwear. The evidence on this issue was vigorously disputed on both sides and the trial court did not make any specific finding on this issue, nor do we think one is needed for our decision.

■ As the trial court aptly noted, the merchandise itself is often a potent witness in classification cases. *Marshall Field & Co. v. United States,* 45 CCPA 72, 81 C.A. D. 676 (1958). We have examined the exhibits representing the imported merchandise and while it clearly is embryo footwear, it is also clearly in the infant stages of manufacture. It does not tell us it is substantially complete. In *Channel Master, supra,* the importer urged that the imported articles were not substantially complete, because they were missing certain component parts. The court deemed the merchandise substantially complete owing to the "relatively quick, simple, and costless steps required for untrained consumers to insert" the missing parts into the merchandise. Here, the time, effort, and cost to complete the merchandise is not insignificant. Based upon our examination of the merchandise as its own witness, as well as the above-discussed analysis, we are left with the definite and firm conviction that a mistake has been committed and therefore reverse the trial court's finding that the footwear is substantially complete as imported.

Thus, we have determined that the involved articles were not "unfinished footwear" and could not properly have been classified under TSUS items 700.35 and 700.67. On the other hand, we are unable on the present record, and in the absence of

findings by the Court of International Trade, to discern what the true classification should have been. This would formerly have required affirmance of the erroneous classification since under former law, the importer had a dual burden to establish the error of the Customs classification, and the correctness of a classification properly claimed by it. By *Jarvis Clark Co. v. United States*, 733 F.2d 873, 2 Fed.Cir. (T) 70 (1984), this unique rule has been held repealed by Congress. The original classification having been tested and found wanting on our review, the case can now be remanded to the Court of International Trade to find a correct answer, whether previously claimed or not claimed by the importer. If need be, a further remand to the Customs Service for consideration by it is also permissible under the *Jarvis Clark* rules. The correctness of Customs classifications is too important a matter to be made the subject of word games any longer, and the courts are too burdened with cases for the same or similar entries to be litigated and relitigated over and over again.

### Conclusion

Since the trial court's classification of the imported merchandise under TSUS 700.35 and 700.67 is erroneous, we reverse its judgment of dismissal. We remand the case for further proceedings consistent with this opinion.

### Costs

Costs are awarded to Simod.

**REVERSED AND REMANDED.**