Slip Op. 03 - 58

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - x

C.J. TOWER, INC.,                              :

                         Plaintiff, :

         v.                                    :  Court No. 92-01-00035

                                               :

UNITED STATES,                                 :

                         Defendant.            :

                                               :

- - - - - - - - - - - - - - - - - - x

<u>Opinion & Order</u>

[Upon cross-motions as to classification of
 machinery used in processing paper pulp,
 summary judgment for the defendant.]


                              Decided:  May 30, 2003


    <u>Barnes, Richardson & Colburn</u> (<u>Sandra Liss Friedman</u>) for the
plaintiff.

    <u>Robert D. McCallum, Jr</u>., Assistant Attorney General; <u>John  J.
Mahon</u>, Acting Attorney in Charge, International Trade Field Office,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (<u>Bruce N. Stratvert</u>); and Office of Assistant Chief Coun-
sel, International Trade Litigation, U.S. Bureau of Customs and
Border Protection (<u>Edward N. Maurer</u>), of counsel, for the defend-
ant.


         AQUILINO, Judge:  The parties to this action have managed

to reduce its essence to but a few words selected from the Har-

monized Tariff Schedule of the United States (HTSUS) (1989), not-

withstanding the impressive size and complexity of the underlying

machinery imported from Canada to advance the processing of pulp

into the kind of material upon which those words have been written.

Duties of 3.1 percent *ad valorem* were assessed on the seven entries of that equipment by the U.S. Customs Service per HTSUS subheading 8421.21 ("Filtering or purifying machinery and apparatus for liquids: For filtering or purifying water"). The importer of record of the merchandise lodged a protest of that classification which was denied by Customs, whereupon the plaintiff presses its prayer herein for duty-free entry under HTSUS subheading 8439.10 ("Machinery for making pulp of fibrous cellulosic material").

Each side is of the view that it is entitled to judgment as a matter of law. That is, each takes the position that there is no genuine issue as to any material fact within the meaning of USCIT Rule 56(c) and has therefore moved for summary judgment pursuant that rule.

I

Rule 56(h) provides that, upon any motion for summary judgment, there shall be annexed a statement of the material facts as to which the moving party contends there is no genuine issue to be tried and also that the

> papers opposing a motion for summary judgment shall include a separate . . . statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Appended to plaintiff's motion is its required affirmative statement, along with a supporting affidavit by the manager of the successor to the corporate manufacturer of the equipment at bar.  Among other things, that statement avers:

4.  The imported merchandise consists of machines known as disc filters . . . and drum filters . . . which are specially designed for use solely in the pulp making process.

5.  As imported, the disc filters are used in the thermo-mechanical pulp making process to reduce a pulp slurry consisting of approximately one percent wood chip fiber and 99 percent water to approximately ten percent fiber and 90 percent water, a process known as "deckering" or "thickening".  This is done to facilitate high density storage of the pulp during the pulp making process.

6.  The imported disc filters consist of a central collector containing up to thirty parallel filters in disc shape, each filter consisting of up to twelve individual sectors.  Each sector is made up of a stainless steel frame with a membrane or filter cloth composed of polypropylene stretched over its face.

7.  In addition, the other main components of the disc filters are the vat, which is the bottom portion . . . through which the slurry passes during the thickening process; the feedbox, through which the rate and density of the slurry entering the machine is controlled and which is welded to the vat; the bronze worm gear and bearings used to drive the machine; the dectagonal center shaft connected to the valve, through which the filtrate (water and some pulp fibers) is extracted; the valve controlling the vacuum, which connects the barometric leg with the center shaft; the stainless steel hood that serves as a cover for the machine; oscillating showers for cleaning the cover; the discharge nozzles for removal of thickened pulp from the sectors; the crenelation chutes that assist in discharging the thickened pulp; and, a repulper conveyor that blends and channels the thickened pulp out of the machine toward the storage area.

8.  Each disc is up to 15 feet in diameter, and can provide an approximate filtration area of 310 square feet.

9.  The discs and center shaft are rotated at approximately 1 RPM.

10. As the discs rotate, the lower portion of each sector passes through the one percent slurry contained in the vat.

11. As the vacuum is applied to each disc, the pulp adheres to the filter cloth on the sectors.  Some of the filtrate from the one percent slurry passes through the filter cloth into the center shaft and out of the machine, down a twenty-five foot barometric leg, leaving fibers adhering to the outside of the filter cloth.

12. The discharge nozzles apply a water spray, consisting of water previously removed during the process, to free the remaining pulp slurry from each sector.

13. The discharged pulp fiber is removed from the machine through the crenelation chutes.

14. The pulp fiber drops through the crenelation chutes into the repulper conveyor, which then transfers the thickened pulp fiber to storage tanks.

15. The pulp fiber has now been concentrated from a one percent consistency to approximately a ten percent consistency.

16. When the pulp fiber is to be transferred to the next stage in the pulpmaking process, it is rediluted with the filtrate previously removed during the pre-storage concentration, or with water taken from the pulpmill.  At this time, the slurry is rediluted to yield approximately the same one percent wood chip pulp/99 percent water consistency that it had prior to deckering. This allows the pulp slurry again to flow freely.

17. The disc filters are also used in "saveall" applications, a process designed to remove additional fibers and chemicals from "white water."  White water refers to the liquid component of the pulp slurry after it was separated from the wood fibers during dewatering, which occurs after the slurry passes through the forming wire of the paper making machine.

18. After the saveall application, the white water is either returned to the pulpmill and used as dilution or shower water, or is sent to an effluent unit for filtering and purifying prior to disposal as waste. The recovered fibers are returned to the feed stock.

19. As imported, the drum filters are used in pulp mills as deckers for thickening the pulp slurry to facilitate its storage during the paper making process.

20. The drum filter is approximately twelve feet wide in diameter, and is covered with a polypropylene filter cloth that acts as a membrane through which water passes.

21. In addition, the other main components of drum filters are the vat, which is the bottom portion . . . through which the slurry passes during the thickening process; feedbox, through which the rate and density of the slurry entering the machine is controlled; cylinder head drive unit, which is used to drive the drum; center shaft connected to the valve, through which the filtrate is extracted; the valve controlling the vacuum, which connects the barometric leg with the center shaft; doctor blade used to lift the pulp sheet off the membrane; and, repulper conveyor that channels the thickened pulp out of the machine toward the storage area.

22. The drum filter is rotated through the vat containing the one percent pulp slurry. A vacuum created through the action of the barometric leg and the valve is applied to the drum, which causes a sheet to build up on the drum's outer surface.

23. The vacuum also draws some of the filtrate through the cylinder into the center shaft, which removes the water from the drum via the valve and the barometric leg.

24. A doctor blade is used to lift the pulp sheet off the drum's filter cloth, where it is then removed by the repulper conveyor and thereafter transferred to storage.

25. At this point, the pulp slurry has been concentrated to approximately a ten percent consistency.

26. Drum filters are built to customer specifications and their dimensions depend on plant production, physical size and fiber characteristics.

27. As imported, the drum filters may also be used in saveall applications to recover fibers and chemicals from the white water after the slurry has been dewatered.

28. As in the case with disc filters when used in saveall applications, after using a drum filter in a saveall application, the white water is either returned to the pulp mill and used as dilution or shower water, or is sent to an effluent unit for filtering and purifying prior to disposal as waste.

29. As imported, the drum filters can only be used as deckers or in saveall applications. While drum filters may be designed for use in washing or deinking operations, th[ose] at issue are not designed for such use, nor can they be used in [such] applications because they lack shower pipe assemblies, necessary components for washing.

30. The imported merchandise is not used to completely remove the water component from the pulp component in the paper slurry.

31. The imported merchandise is not used to separate water containing chemicals from the pulp slurry.

32. The filtrate removed from the pulp slurry during the deckering process is returned to the pulp slurry once the slurry is ready to be moved to the next step in the pulpmaking process.

33. The filtrate removed from the pulp slurry is not replaced with clear water.

34. The imported merchandise is not used in the final dewatering stage of the paper making process.

35. The imported merchandise is not suitable for use in the final dewatering stage of the papermaking process.

36. The imported devices are machinery used in the process for making pulp of fibrous cellulosic materials.

37. Thickening or deckering is a necessary step in making pulp of fibrous cellulosic materials.

Defendant's formal response to this statement admits foregoing paragraphs 6, 8, 9, 11, 20, 22, 23, 26 and 30. It admits in part paragraphs 4, 5, 7, 10, 12-19, 21, 24, 25, 28, 29, 34-37. Paragraphs 27 and 33 are denied "for lack of information". Defendant's denials of paragraphs 31 and 32 state:

> 31. . . . [T]he Government believes the statement turns on the meaning of "separate." Based on plaintiff's brief, it appears plaintiff interprets "separate" as requiring a complete separation. If that definition of "separate" applies, then it is true the imported merchandise does not remove 100% of the water in the pulp stock.
>
> 32. . . . While we agree that a liquid may be added to the 10% pulp slurry during later operations, we do not believe that the liquid is water with the same characteristics as the filtrate that is removed by the deckering process. We believe the water which is used to rehydrate the slurry is a cleaner water, with fewer of the contaminants that are removed in the deckering process, such as dirt, bark, undigested wood chips, and dissolved chemicals.

The defendant avers that these two denials, as well as that of paragraph 33, "may create a material issue of fact". It suggests the same with regard to certain, partial denials of paragraphs 5, 12 and 16. To the extent it has denied any part of the paragraphs not admitted on their face, the defendant does not consider that those responses engender any material issue of fact requiring trial.

Indeed, the defendant itself has cross-moved for summary judgment. Its Statement of Additional Material Facts as to Which There is No Genuine Issue to be Tried, which is accompanied by dec-

larations from two Customs National Import Specialists, is as follows:

> 1. Disc and drum filters are used in a wide variety of industries and processes, including the treatment of metallurgical slurries, food processing, sewage treatment, petroleum and chemical processing, as well as in pulp processing. . . .

> 2. In all these operations, the disc and drum filters operate on the same guiding principle and employ . . . much of the same technology. Specifically, a feedstock contains two or more different materials (a liquid and a solid); the feedstock passes over a selective barrier; a portion of the liquid (and some solid particles small enough to pass through the barrier) passes through the barrier, while the rest of the materials do not pass through, and instead adhere to the surface of the selective barrier. The adhering material is then removed from the machine, and thus, the feedstock is physically separated into two materials with their own compositions; one is richer in one of the feedstock materials, and the other is poorer. . . .

> 3. The disc and drum filters are commonly referred to in reference books and in the industries that use them as filtering machines. . . .

> 4. The water that is added back to the thickened pulp has a lower concentration of particulate matter and/or dissolved chemicals than the water which is the filtrate from the thickener. After the "water" has been added back, the pulp has been beneficiated because the concentration of impurities in the water-- particulate matter and dissolved chemicals-- has been significantly reduced by the process. . . .

> 5. Water is added back after one or more intermediate steps, which are "high consistency" operations. . . .

The plaintiff has not filed any response to this statement, whereupon the defendant has interposed a motion to deem its contents admitted. Plaintiff's reply to this motion is that,

because Defendant's Material Fact Statement does not
contain material facts as defined in Anderson [v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)], they are not
deemed admitted pursuant to CIT Rule 56[(h), supra].

As indicated hereinafter, the court concurs, and defendant's motion for admission is hereby denied.

As for plaintiff's own statement, quoted above, its proponent has interposed a motion to strike defendant's response thereto as not in conformity with Rule 56(h), supra, and thus to deem that statement admitted in its entirety thereunder. Plaintiff's point is well-taken, as nowhere therein does the defendant "contend[] that there exists a genuine issue to be tried." Indeed, to repeat, both sides are of the view that this action does not require a trial.[1]

Upon review of all of the papers presented by them, and as discussed hereinafter, the court concludes that this action is susceptible to summary judgment. Jurisdiction is pursuant to 28 U.S.C. §1581(a).

II

Defendant's classification (8421.21) and plaintiff's proposed alternative classification (8439.10) are found within 1989 HTSUS chapter 84 of its section XVI, which encompasses machinery

---

[1] See, e.g., Plaintiff's Motion for Summary Judgment, first page; Defendant's Opposition to Plaintiff's Motion to Strike its Response to Plaintiff's Statement of Facts Not in Dispute, p. 1.

and mechanical appliances, etc.  Headnote 2 to that chapter states

that, subject to the operation of note 3 to section XVI,

> a machine or appliance which answers to a description in
> one or more of the headings 8401 to 8424 and at the same
> time to a description in one or more of the headings 8425
> to 8480 is to be classified under the appropriate heading
> of the former group and not the latter.

The referenced note 3 states:

> Unless the context otherwise requires, composite machines
> consisting of two or more machines fitted together to
> form a whole and other machines adapted for the purpose
> of performing two or more complementary or alternative
> functions are to be classified as if consisting only of
> that component or as being that machine which performs
> the principal function.

A

As oft opined by the Court of Appeals for the Federal

Circuit, e.g., Rocknel Fastener, Inc. v. United States, 267 F.3d

1354, 1356-57 (Fed.Cir. 2001), the meaning of a tariff term, a

matter of statutory construction, is a question of law, citing

Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1366 (Fed.Cir.

1998).  When, as in this action, that term is not defined in either

the HTSUS or its legislative history, its "correct meaning is its

common meaning."  Mita Copystar America v. United States, 21 F.3d

1079, 1082 (Fed.Cir. 1994).  The common meaning of a term used in

commerce is presumed to be the same as its commercial meaning.

Simod America Corp. v. United States, 872 F.2d 1572, 1576 (Fed.

Cir. 1989).  To ascertain that common meaning, a court "may consult

dictionaries, scientific authorities, and other reliable informa-tion sources"[2] and "lexicographic and other materials."  Id.

(1)

The crux of the instant controversy, according to the plaintiff in its motion, is that the imported merchandise is not a filter for purposes of HTSUS subheading 8421.21[3]; "[d]ictionary and scientific lexicons . . . specifically acknowledge that the im-ported devices are not filters."  Plaintiff's Memorandum of Law, p. 8.  The defendant disagrees.

(a)

To refer first to such sources is to learn that the McGraw-Hill Dictionary of Scientific and Technical Terms, p. 799 (6th ed. 2003), for example, defines filter as a "porous article or material for separating suspended particulate matter from liquids by passing the liquid through the pores in the filter and sieving out the solids".  Webster's Third New International Dictionary, p. 850 (1993), defines the term as "a porous article or mass (as of cloth, paper, or sand) that serves as a medium for separating from a liquid or gas passed through it matter held in suspension or

---

[2] C.J. Tower & Sons of Buffalo, Inc. v. United States, 69 CCPA 128, 133, 673 F.2d 1268, 1271 (1982).

[3] The plaintiff argues that the imported machines "do not filter or purify, and are primarily used to thicken pulp on a temporary basis by removing some of the water component from the stock."  Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment, p. 5.

dissolved impurities or coloring matter".  Volume 7 of the McGraw-

Hill Encyclopedia of Science and Technology (9th ed. 2002),

describes the process of filtration at page 119 in the following

manner:

> The separation of solid particles from a fluid-
> solids suspension of which they are a part by passage of
> most of the fluid through a septum or membrane that re-
> tains most of the solids on or within itself.  The septum
> is called a filter medium, and the equipment assembly
> that holds the medium and provides space for the accumu-
> lated  solids is called a filter.  The fluid may be a gas
> or a liquid.  The solid particles may be coarse or very
> fine, and their concentration in the suspension may be
> extremely low (a few parts per million) or quite high
> (>50%).
>
> The object of filtration may be to purify the fluid
> by clarification or to recover clean, fluid-free parti-
> cles, or both.  In most filtrations the solids-fluid
> separation is not perfect.  In general, the closer the
> approach to perfection, the more costly the filtration;
> thus the operator of the process cannot justify a more
> thorough separation than is required.
>
> *   *   *
>
> Liquid filters are of two major classes, cake fil-
> ters and clarifying filters.  The former are so called
> because they separate slurries carrying relatively large
> amounts of solids.  They build up on the filter medium as
> a visible, removable cake which normally is discharged
> "dry" (that is, as a moist mass), frequently after being
> washed in the filter.  It is on the surface of this cake
> that filtration takes place after the first layer is
> formed on the medium.  . . .

A similar definition of filtration is found in 1 Van Nostrand's

Scientific Encyclopedia, pp. 1146-48 (7th ed. 1989), to wit:

> A very common requirement of several industries,
> such as chemical and biologicals manufacturing, food
> processing, ore processing, and water and waste treat-
> ment, is the separation of solids that are suspended in
> liquids.  Filtration is a principal means for effecting
> such separation.  . . .

In filtration, the suspension containing the solids is caused to pass through a porous medium. Numerous filtering media are used, including paper, cloth, and wire cloth. Filtration may be conducted under positive pressure or vacuum.

\* \* \*

**Rotary Drum Filters**. This design is probably the most versatile and widely used continuous filter in the process industries. The rotary drum filter makes it possible to concentrate slurry solids to dry (moist) cakes, to wash solubles from such cakes when needed, and to produce a clarified effluent. . . .

A horizontal drum is partially submerged in a vat that contains the slurry to be filtered. A vacuum is applied through a central valve on the drum shaft to individual compartments or sections that provide support and drainage for the filter medium. The filter cake is formed while the sections were immersed. When the sections emerge (because of continuous rotation of the drum), additional dewatering takes place as air passes through the cake, thus displacing a significant portion of the mother liquor. Before final dewatering, wash water may be applied to remove any remaining soluble solids. Discharge of the dewatered cake is effected by cutting off the vacuum and applying a reverse air blow. As the cake separates from the filter cloth, a scrapper blade deflects it whereupon it is dropped to a conveyor or discharge trough below. . . .

(b)

The plaintiff does not present definitions of filter and filtration that differ materially from the foregoing. Rather, it emphasizes the limited separation of water[4] from the slurry by its machines and the fact that even that partial dewatering is only temporary, with water returned to the pulp during subsequent processing. In support of its thesis that that thickening or

---

[4] See, e.g., Plaintiff's Rule 56(i) Statement, para. 30; Affidavit of Harry A. Abbott, para. 37; Plaintiff's Memorandum of Law, pp. 9, 12, 14; Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgement, p. 7.

"deckering" does not amount to filtration, the plaintiff refers the court to Noss Company v. United States, 7 CIT 111, 588 F.Supp. 1408 (1984), aff'd, 753 F.2d 1052 (Fed.Cir. 1985), and A.N. Deringer v. United States, 10 CIT 798, 656 F.Supp. 670 (1986), aff'd, 832 F.2d 592 (Fed.Cir. 1987), both of which cases have been affirmatively relied upon in Arthur L. Franklin v. United States, 289 F.3d 753, 758-59 (Fed.Cir. 2002).  At issue in Noss was the classification under the Tariff Schedules of the United States ("TSUS") then in effect of a centrifugal cleaner known as a *Radiclone*, which was used for treating pulp in the papermaking process.  The evidence in that action, as in this one, showed importation of the merchandise for use in that process.  Upon final analysis, however, the court in Noss could not overlook the TSUS headnote of the kind quoted hereinabove, which afforded precedence to the government's classification (albeit proposed for the first time at trial) over the specific TSUS item favored by the plaintiff but subordinate in the governing tariff schedule.  See 7 CIT at 117, 588 F.Supp. at 1413.  That is, the court concluded that the *Radiclone* satisfied TSUS item 661.95 ("Centrifuges; filtering and purifying machinery and apparatus . . . for liquids or gases") by finding it to be within a general class of machinery "that have the effect of removing impurities from liquids or gases by various processes."[5]

---

[5] 7 CIT at 116, 588 F.Supp. at 1413.  The court apparently accepted the parties' agreement that the *Radiclone* "does not 'filter' since that process involves the passage of the impure material over a porous surface", id., but it determined to disregard TSUS item 661.95's conjoiner of "filtering" with "purifying", finding that that "apparatus . . . rid liquids or gases of impurities."  7 CIT at 116, 588 F.Supp. at 1412.

"This sort of equipment is often referred to as 'liquid-solid separators[]' . . .." Id.

The court in A.N. Deringer, supra, found the primary purpose of the subject merchandise was to filter and purify raw maple sap by filtering excess water away from it. The "process described is filtering or purifying whether the permeate (excess water) or the concentrate (dewatered sap) is the ultimate product desired." 10 CIT at 800, 656 F.Supp. at 672. Moreover, that ultimate product was obtained by applying heat to cause additional water to evaporate therefrom. See 10 CIT at 799, 656 F.Supp. at 671.

In short, plaintiff's quantum thesis of filtration is neither supported by the case law nor by the definitions referred to above. Indeed, as quoted from the McGraw-Hill Encyclopedia of Science and Technology, "the closer the approach to perfection, the more costly the filtration; thus the operator of the process cannot justify a more thorough separation than is required."

III

In conclusion, there is no question, and the court so finds, that plaintiff's machinery is for making pulp of fibrous cellulosic material within the meaning of HTSUS subheading 8439.10, but the court also concludes that that merchandise falls within the ambit of subheading 8421.21 ("Filtering . . . machinery and apparatus for liquids:  For filtering . . . water") and that head-

note 2 to HTSUS chapter 84 of its section XVI, <u>supra</u>, therefore counsels classification under that lower-numbered subheading.  <u>Cf</u>. <u>A.N. Deringer v. United States</u>, 10 CIT 798, 801, 656 F.Supp. 670, 672 (1986), <u>aff'd</u>, 832 F.2d 592 (Fed.Cir. 1987).  In fact, plaintiff's most articulate papers[6] in support of its motion for summary judgment, nonetheless, name the goods at issue throughout as "filters".  This being what they in essence are, that motion for relief from the duties imposed must be denied, and defendant's cross-motion for summary judgment will therefore be granted.
        So ordered.

Decided:  New York, New York
          May 30, 2003

                              _____
                                        Judge

_____

[6] Subsequent to their filing and also to a decision of the Court of International Trade <u>sub</u> <u>nom</u>. <u>Arthur L. Franklin d/b/a Health Technologies Network v. United States</u>, 25 CIT ___, 135 F.Supp.2d 1336 (2001), the plaintiff has called this court's attention to the reversal of that decision by the Court of Appeals for the Federal Circuit, <u>Arthur L. Franklin v. United States</u>, 289 F.3d 753 (2002).  Plaintiff's letter expresses the belief that that opinion on appeal "supports the construction of the phrase 'filtering or purifying machinery' espoused by plaintiff [here]in".  To be sure, this court has difficulty understanding how.  At issue in that matter was "Franklin's one-gram bag[] of coral sand", 289 F.3d at 761, admittedly intended to purify a glass of $H_2O+$ for human consumption, but how that sand can truly be classified under HTSUS heading 8421 ("Centrifuges, including centrifugal dryers; filtering or purifying **machinery and apparatus . . .** ") only the members of the particular panel of the court of appeals might be able, but have yet, to explain.