# United States Court of Appeals for the Federal Circuit

04-1386

DAL-TILE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Jeffrey W. Herrmann, McGuire Woods LLP, of New York, New York, argued for plaintiff-appellee. With him on the brief was Joseph S. Kaplan.

Saul Davis, Attorney, International Trade Field Office, United States Department of Justice, of New York, New York, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC; and Barbara S. Williams, Attorney in Charge, International Trade Field Office, of New York, New York. Of counsel on the brief was Beth Brotman, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Senior Judge R. Kenton Musgrave

# United States Court of Appeals for the Federal Circuit

04-1386

DAL-TILE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  September 30, 2005

_____

Before RADER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and PROST, Circuit Judge.

PROST, Circuit Judge.

Defendant-Appellant United States ("the government") appeals from a decision of the Court of International Trade granting judgment in favor of Plaintiff-Appellee Dal-Tile Corporation ("Dal-Tile").  Dal-Tile v. United States, No. 95-05-00679 (Ct. Int'l Trade Mar. 16, 2004) ("Dal-Tile").  Because we find that the Court of International Trade correctly construed the Tariff Schedules of the United States ("TSUS") and correctly determined that the imported goods qualified for duty free treatment under the Generalized System of Preferences ("GSP"), we affirm the decision of the Court of International Trade.

I. BACKGROUND

## A. The Administrative Protest

In 1955, Dal-Tile opened a tile factory in Mexico to produce tiles from the raw materials of talc and clay that are exported from the United States into Mexico. In Mexico, the talc and clay are ground with wollastonite and scrap tile from Mexico, mixed, and pressed to form tiles, which are finished with a glaze made partially from the imported clay but mostly with frit, silica, and zinc from Mexico.

In 1984, 1985, and 1988, Dal-Tile imported wall tiles from Mexico into the United States. Dal-Tile at 3. Dal-Tile entered the tiles as "ceramic articles" under item 532.34 of the TSUS, which applies to "Ceramic tiles: Floor and wall tiles: Mosaic tiles: Other" and defines "ceramic article" as: "hardened by such heat treatment that the body if reheated to pyrometric cone 020 would not become more dense, harder, or less porous, but does not include any glass article." Headnote 2(a), Part 2, Schedule 5, TSUS ("Headnote 2(a)"). Under Headnote 2(a), a duty rate of 19-20.8% applies. "Pyrometric cone 020 is the state of energy required to deform a cone of a particular composition and size, and it may be achieved through different time and temperature combinations." Dal-Tile at 4-5.

In 1993, Dal-Tile filed an administrative protest contesting the classification and assessment in liquidating these entries by the United States Customs and Border Protection ("Customs").[1] Id. at 4. Dal-Tile claimed that the tiles should have been classified under item 523.94(A), TSUS as "Mineral substances, and articles of mineral substances not specifically provided for: Other: Not decorated" which entitles the tiles to duty-free treatment under the GSP.

---

[1] Customs was formerly known as the United States Customs Service.

B.  The Court of International Trade Proceedings

On March 16, 2004, the Court of International Trade held that "[t]he articles are to be classified under item 523.94, TSUS." Dal-Tile at 69.  In reaching this conclusion, the court considered the government's various arguments that Dal-Tile's proposed construction of Headnote 2(a) led to absurd results, Dal-Tile's testing methodology was improper under Headnote 2(a), Dal-Tile's test results showed only de minimis changes that should be ignored, and the articles did not qualify for duty-free treatment under the GSP.

The Court of International Trade construed the statutory language and concluded that Headnote 2(a) clearly excludes any articles that become "more dense, harder, or less porous" when "reheated to pyrometric cone 020." Id. at 19.  "In other words, classification is to be based on testing which produces empirical results.  The meaning of Headnote 2(a) is plain and unambiguous:  it bases classification on the effect of reheating subject articles to pyrometric cone 020." Id. at 20. The Court of International Trade found that "the statutory language was clearly and deliberately inserted, the application of the plain meaning is not absurd, and the government fails to propose a workable alternative." Id. at 24.  In doing so, it rejected the government's argument that such an exclusion would lead to the absurd result that only a few of the wall tiles would meet the statutory test as "mere speculation [since]. . . [t]here was no testimony to the effect that the Dal-Tile test would result in exclusion of 'all' commercial-standard ceramic wall tile from such classification." Id.

Second, the court considered the government's argument that Dal-Tile's testing methodology was improper. "Dal-Tile's protests for 1984, 1985 and 1988 entries resulted in reliance upon tests of samples produced from 1988 and later by Customs' New Orleans laboratory, since tiles for most of the challenged shipments were no longer available." Id. at 8. However, the court found that the use of later samples was proper since the tiles remained unchanged. Id. at 7 ("The characteristics of Dal-Tile's tunnel-kiln fired wall tile have not changed over time."). In support of this finding, it noted that:

> The raw materials for wall tiles have come from the same mines, the manufacturing process has remained essentially unchanged, Ceramica Regiomontana [Dal-Tile's plant in Monterrey, Mexico] has used the same or more modern versions of the basic tile-making equipment (e.g., mills, pressing equipment, dryers, except for one of the 14 tunnel kilns which has not been updated since it was first put into use in 1955), and the 1776 formula has been employed since 1976 to create consistent end product.

Id.

The court first examined the testing method used by Customs. "The New Orleans laboratory method [used by Customs] involved taking one tile, cutting it into at least five pieces, subjecting the pieces to the five-hour boil and 24-hour soak specified in C-373, testing for absorption, and then reheating those pieces to pyrometric cone 020." Id. at 9. Notably, the court cited the testimony of a quality control manager and former senior analyst at the New Orleans Laboratory testifying for the government, who stated that she was not aware of a rationale for taking one tile and cutting it into five samples. Id. The court then found that the results by the Customs' testing method were "incoherent" because "they showed that the absorption of the samples either increased, decreased, or stayed the same, depending upon interpretation." Id. Further, it noted that "[t]he Customs laboratory did not use any control samples." Id.

The Court of International Trade then considered the testing method employed by Dal-Tile. It noted that Dal-Tile first "conduct[ed] physical experimentation to determine the appropriate cycles (temperature/time) to achieve cone 020," then "test[ed] at the extremes (the slowest and fastest rates the Dal-Tile kiln could achieve cone 020)," at "the rate Customs selected," and at "intermediate temperature equivalents that achieve cone 020." Id. at 10. Instead of breaking the tiles into five pieces as Customs did, "[f]or each temperature equivalent, Dal-Tile broke 15 tiles into halves." Id. The Court of International Trade found that "[a]s a population, when compared against the samples which were not reheated, the wall tile samples became less absorbent after reheating to cone 020." Id. It found that "[o]nly Dal-Tile's method employed a control sample." Id. at 37.

Applying the factors established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the Court of International Trade thus rejected the government's argument that Dal-Tile's testing methodology was improper, finding instead that Dal-Tile's precision in using a large sample population and using control samples against which to check the results "confirm[ed] the reliability of Dal-Tile's split-tile method." Id. at 30; see also Libas, Ltd. v. United States, 193 F3d 1361, 1366 (Fed. Cir. 1999). After it examined the four factors enunciated in Daubert to determine reliability, it held that "[c]onsideration of the Daubert principles thus supports finding in favor of Dal-Tile's methodology over Customs' methodology." Dal-Tile at 35.

Third, the Court of International Trade rejected the government's claim that the changes in the tiles that resulted from Dal-Tile's testing were de minimis and should be ignored, finding instead that Headnote 2(a) does not exclude de minimis changes. Id. at

26-27. It further found that, regardless, the changes in the tiles shown by Dal-Tile's test methodology were not de minimis. Id. at 27. It found that the changes observed through Dal-Tile's method, which was conducted by a single operator, exceeded the 0.2% precision requirement. Id.

Finally, the Court of International Trade held that the tiles were eligible for duty-free treatment under the GSP because 35% of the value of the tiles was produced in Mexico. Id. at 63. Indeed, the Court of International Trade held that the tiles were "100 percent" Mexican products since the non-Mexican components were substantially transformed into new and different articles of commerce in Mexico. Id. at 60. Additionally, according to the Court of International Trade, "even if the non-Mexican components are excluded from the value of the wall tile the remainder still exceeds the required 35% minimum threshold." Id. at 63. The Court of International Trade thus concluded that "[t]he articles are to be classified under item 523.94, TSUS [and] [t]hey are also entitled to duty-free entry under the GSP." Id. at 69. This appeal ensued.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A. Standard of Review

The determination of the proper interpretation of a tariff provision is a question of law reviewed de novo. Rollerblade, Inc. v. United States, 282 F.3d 1349, 1351 (Fed. Cir. 2002). However, a determination that an import fits within a tariff provision is a finding of fact reviewed for clear error. Id. All facts underlying legal determinations are reviewed for clear error. Dainippon Screen Mfg. Co. v. CFMT, Inc., 142 F.3d 1266, 1269 (Fed. Cir. 1998).

04-1386                                    6

B. Absurd and Anomalous Results

On appeal, the government submits that the Court of International Trade's construction of Headnote 2(a) must be erroneous because it would lead to absurd and anomalous results. It argues that the court's construction excludes most, if not all, wall tiles considered "ceramic" in the industry. Moreover, it argues that the court's acceptance of Dal-Tile's test methods also leads to absurd results.

1. Scope and Intent of Headnote 2(a)

The Court of International Trade, according to the government, failed to properly interpret the scope and intent of Headnote 2(a). Namely, the government argues that, under the Court of International Trade's interpretation of the classification under Headnote 2(a), "the vast majority of, if not all" wall tiles would be excluded from Headnote 2(a), a result contrary to Congress's intent. The government maintains that this result is absurd, and thus contrary to statutory construction principles. Dal-Tile disagrees, responding that the Court of International Trade correctly applied the statute in accordance with its plain meaning as required under statutory construction principles. Dal-Tile further argues that the exclusion of "some, or even many" wall tiles from classification under Headnote 2(a) does not denote absurd results and that the government made no evidentiary showing otherwise.

The statutory language of Headnote 2(a) is clear and the application of the plain meaning is not absurd. As the Court of International Trade correctly observed, the government's argument that its construction of Headnote 2(a) would lead to absurd results is "mere speculation" because it proffered no evidence that all wall tiles meeting the commercial definition of "ceramic" would be excluded from Headnote 2(a) under this

construction. "There was no testimony to the effect that the Dal-Tile test would result in exclusion of 'all' commercial-standard ceramic wall tile from such classification, and the matter here concerns only Dal-Tile's slow-fired 4 1/4 x 4 1/4 wall tile and associated trim." Dal-Tile at 24.

The very narrow scope of the absurdity exception to the plain meaning principle of statutory construction does not apply in this case where there is no evidence that all wall tiles deemed "ceramic" in the industry would be excluded from Headnote 2(a). See Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 470 (1989) (Kennedy, J., concurring) (noting that the exception is limited to where "it is quite impossible that Congress could have intended the result"). Headnote 2(a) clearly requires that to be classified as "ceramic," articles may not become more dense, harder or less porous when "reheated to pyrometric cone 020." The language is clear, referring to specific temperatures and requiring testing that would not be done for commercial purposes.

Moreover, we reject the government's argument that this court should examine the legislative history to show a different meaning than the clear language. See Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 132 (2002). As this court has previously held, where the meaning of the statute is clear, "that is the end of the matter" and this court should not examine the legislative history. Int'l Bus. Mach. Corp. v. United States, 201 F.3d 1367, 1372 (Fed. Cir. 2000). Even if the legislative history of Headnote 2(a) were relevant, however, it supports the statute's clear meaning. The legislative history emphasizes the requirement to determine which tiles become more dense, harder or less porous after reheating to cone 020, clarifying that these tiles should not be classified as "ceramic." Hence, Congress's intent is clear that it meant to base

classification under Headnote 2(a) by the physical properties of the articles. Accordingly, we affirm the Court of International Trade's construction of Headnote 2(a).

## 2. Dal-Tile's Test Methods

With regard to Dal-Tile's testing of the wall tiles, the government further contends that the Court of International Trade erred in accepting Dal-Tile's test methodology and results. Specifically, the government first argues that the method disregards the conditions laid out by the Supreme Court in Daubert. Second, the government argues that the results are contrary to the requirements set forth by Headnote 2(a) because they show only de minimis changes, and de minimis changes are insufficient under the statute. The government contends that Dal-Tile's method of splitting the tiles in half and comparing the two halves, instead of comparing the same piece of tile to itself, is unreliable. Dal-Tile disputes the government's contention, arguing that its methodology is reliable and that the government's method lacked scientific validity.

The Court of International Trade, in our view, properly examined the four factors enunciated in Daubert to determine reliability and found that "[c]onsideration of the Daubert principles thus supports finding in favor of Dal-Tile's methodology over Customs' methodology." Dal-Tile at 35. Furthermore, examining the statute, we find that Dal-Tile's methodology is not contrary to Headnote 2(a). Headnote 2(a) does not require that testing for density, hardness and absorptivity before and after reheating be performed on the same pieces of the same tiles. Both the government's test on the same piece before and after reheating and Dal-Tile's test on one piece of the split-tile before reheating and the other piece of the same tile afterwards are permitted under the statute, where Congress only states that "pieces of the body of such an article" must be

tested before and after reheating them to cone 020. Therefore, we find that Dal-Tile's test method was not barred by Headnote 2(a), and indeed, we note that Dal-Tile's method included a large sample and a control group where as the government's test did not.

In a related argument, the government contends that Dal-Tile's test shows only de minimis changes in the increase in density and decrease in porosity, and de minimis changes should be disregarded under the statute. In other words, the government argues, the tiles imported by Dal-Tile fall under Headnote 2(a). Dal-Tile disagrees that the changes are de minimis, noting that the statute refers to a precision standard of only "plus or minus 0.1 percent" and that the changes are larger than 0.1%. We agree and hold that changes of "plus or minus 0.1 percent" are not de minimis and should not be disregarded under the statute. We further acknowledge that the court's factual finding that the changes observed through Dal-Tile's method exceeded 0.2% is proper. Dal-Tile at 27. We therefore affirm the holding by the Court of International Trade that the results from the Dal-Tile test are reasonable.

C. The Reliability of Customs' Testing Method

The government further argues that the court erred in disregarding Customs' method of testing the tiles, because Customs' method is the accepted method under Headnote 2(a) and, in addition, is more reliable than Dal-Tile's method. Dal-Tile responds that the court was correct in finding that both methods are reasonable under the statute, and that its method, not Customs' method, was more reliable because Dal-Tile used standard research techniques such as a larger sample population, statistical checks, and a control group.

As a legal matter in construing the statute, we hold that Dal-Tile's test is valid under Headnote 2(a), which only requires that the method is objective and tests for changes in density and absorptivity after reheating. Headnote 2(a) does not mandate Customs' "double-soak" method of the same pieces of tile before and after reheating to cone 020 over Dal-Tile's "split-tile" method. Second, we disagree that Customs' method is more reliable. Dal-Tile provided ample evidence that the initial soak of the tile in Customs' method affects the tile for purposes of the subsequent reheating. In addition, Dal-Tile's method employed a control sample, a larger sample population, and statistical analyses to test the significance of results. "By contrast, the government's test fails to meet any of the Daubert criteria or employ basic principles or methods of scientific inquiry, such as using a representative sample population, using control groups, or testing the hypotheses via, e.g., statistical checks." Dal-Tile at 38. As the Court of International Trade found, "the elements of Dal-Tile's method which the government challenges actually make Dal-Tile's test more reliable, not less so." Id. Therefore, we affirm the Court of International Trade's decision that Dal-Tile's methods are more reasonable than Customs' methods.

### D. Duty-Free Treatment Under GSP

Finally, the government argues that the court erred in finding that the tiles imported by Dal-Tile qualify for duty free treatment under the GSP. Specifically, the government maintains that Dal-Tile failed to show that the non-Mexican components of the tiles were transformed into new and different articles of commerce in Mexico. Dal-Tile disagrees, responding that the goods were correctly determined to qualify for GSP status. Dal-Tile contends that there is abundant support in the record for the Court of

International Trade's finding that the non-Mexican components were transformed into "new and different articles of commerce." Furthermore, Dal-Tile maintains that the government does not dispute the Court of International Trade's finding that "even if the non-Mexican components are excluded from the value of the wall tile the remainder still exceeds the required 35% minimum threshold." Dal-Tile at 63.

In order to qualify for GSP status under 19 C.F.R. § 19.177(a)(2), Dal-Tile's product must be regarded as material produced in Mexico, which means that there must be a substantial transformation of a raw material of non-Mexican origin into a new and different article of commerce. Although as a legal matter, Dal-Tile argues that the Court of International Trade's holding that "the constituent parts of the wall tile, the dried body and the glaze, represent 100 percent of the subject merchandise and are both of Mexican origin" is correct, we need not reach this question. Dal-Tile at 60. Instead, we rely on the Court of International Trade's finding that, even considering only the Mexican components of the tiles, the tiles qualified for GSP status. We thus affirm the Court of International Trade's holding that the tiles qualify for duty-free treatment under the GSP.

## III. CONCLUSION

We affirm the Court of International Trade and find that the entries qualify for duty-free treatment.

## AFFIRMED